**FARMERS UNDERWRITERS ASSOCIATION, Truck Underwriters Association, Fire Underwriters Association, for themselves and as attorneys-in-fact for the Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, Plaintiffs-Respondents,**

v.

**Maurice G. REID, Defendant-Appellant.**

**No. 24611.**

Kansas City Court of Appeals.

Missouri.

Dec. 4, 1967.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 5, 1968.

Application to Transfer Denied April 8, 1968.

James L. Muller, Muller & Muller, Kansas City, for appellant.

Heilbron & Powell, by Sylvester Powell, Jr., Kansas City, for respondents.

MAUGHMER, Commissioner.

Plaintiff insurance companies were granted a temporary injunction enjoining defendant "from soliciting, accepting or servicing the insurance business of plaintiffs' members and policyholders for a period of one year" after termination of his contract. The year passed before hearing was held on the question of making the injunction permanent. Therefore, because of the time element, the injunction was dissolved. However, defendant sought a declaration that the temporary injunction had been improvidently granted and moved for a jury trial to assess his damages. The court, after hearing the evidence, ruled the injunction had been providently granted and denied defendant a trial for alleged damages. The defendant has appealed.

On January 20, 1961, the parties entered into a written contract styled "Agent's Appointment Agreement". Thereunder defendant was appointed agent for plaintiffs in the Kansas City area to represent those companies in the production of all types of insurance business written by them. Paragraph "E" of the Agreement provided it might be terminated (1) by either party on 30 days' notice; (2) without notice "in the event of fraud or embezzlement * * * or the failure to promptly remit such funds of any of the Companies by the Agent", or for "failure to promptly remit such funds in accordance with prescribed rules, * * *". Under these prescribed rules, premium payments—original or renewal—were to be sent immediately to the companies. If renewal premiums were not received when due, the branch manager's office sent Avoid Cancellation Notices and later if payments were not received, Cancellation Notices were sent to the policyholders. The Agreement

also contained the following under Paragraph "G":

"In the event of cancellation or termination of this Agreement by either party, for whatsoever reason, the Agent will not, for a period of one year from the effective date of cancellation or termination, directly or indirectly, in any manner solicit, accept or service for or on behalf of himself or any insurer, agent or broker, the insurance business of any members or policyholders of any of the Companies within the County or Counties in which the District is located, or within the immediate adjoining Counties, nor will he use or divulge any information or list concerning any of such policyholders or their policies".

Mr. Tom Rossner, Division Agency Manager for plaintiffs, served as liaison between the companies and the agent. He testified that defendant had delayed (longer than the rules prescribed) in remitting premiums on some 35 policyholders; that a Mr. Dusenberry had paid part of a new policy premium on October 27, 1963, but defendant had not remitted to plaintiffs until November 19, 1963.

Mr. Dexter Harvey, District Manager for plaintiffs, testified that early in December, 1963, he became aware of discrepancies in the manner of premium remittances by defendant. He stated that an insured, Alvin B. Hannsz, sent his check for $219 to defendant on November 8, 1963, but defendant applied this payment to other accounts. He said Hannsz was given credit by defendant on November 29, 1963 for $76.65 and this credit was from funds paid by other policyholders, and Hannsz was credited with the balance on December 7, 1963; this, too, being from funds paid by other policyholders. Mr. Harvey declared that his investigation of the plaintiffs' records revealed 41 such discrepancies. He specifically referred to five accounts (Dusenberry, Thomas, Hannsz, Kreegar and Winfrey) whose payments had not been promptly remitted. Mr. Harvey testified that a check from a policyholder, Mr. Brunson, for $166.80, went through the office on October 16, 1963, but Brunson was not credited until December 11. All of these matters were called to the attention of defendant and on December 22, 1963, he brought his accounts up to date.

On December 30, 1963, Mr. Tom Rosner, the Division Agency Manager, terminated defendant's agency agreement because of such discrepancies and pursuant to the provisions of the contract. The Agreement also contained a proviso that in the event of termination, the agent would be given an opportunity to sell for a sum to be determined by multiplying the commissions paid for the preceding six months by two. Defendant decided not to sell and did not sell. It was under a very similar situation that defendant had first become involved as plaintiff's representative.

District Manager, Dexter Harvey, also testified that shortly after termination of defendant's agency he began to receive cancellation notices from policyholders whose accounts had been assigned to and serviced by defendant. Defendant had retained possession of the plaintiffs' premium levy list which showed the policyholders' names, addresses and expiration dates. He said that this list included about 1,000 policyholders, and that from December 30, 1963 until June, 1964, 121 of these clients were lost, but that between June 30 and December 30, 1964, after the injunction, only 24 were lost.

Leta Newman testified that she had been a Farmers policyholder since 1950; that in June, 1964, she wanted to make some changes in her coverage and called defendant about it; that he sent her a policy with a different company, which she refused to accept. Mr. O. S. Cawthon, an Independence, Missouri business man, had been a client of Farmers "for 10 or 12 years". In January, 1964, he went to defendant's office and gave him the premium money for policies on his two automobiles. He said he was unaware that defendant no longer represented Farmers, and that later he received the two policies but the same had been issued by another company.

Mr. Eddie Collins, a fireman for the City of Sugar Creek, had been a Farmers policyholder since 1951. He said defendant contacted him in January, 1964, and suggested or talked with him about changing to another company—that it would be a little cheaper. Mr. Collins stated that he decided to stay with Farmers.

Parts of defendant's deposition were read in evidence. He admitted holding premium collections for as long as two or three weeks, admitted he contacted plaintiffs' policyholders after termination of his contract, and that he placed 62 of those policyholders with another company, or other companies. Defendant, testifying as to his procedure in remitting premium payments, said some policyholders would pay well in advance of the due date—others waited until the premiums were due. As to making remittances, he said: "My primary purpose was to remit the funds prior to the expiration day or cancellation date on the policies". He also testified that after consideration he determined to and did refuse the company's offer to sell for $8709.04 (two times the service commissions paid to him during the six months' period immediately preceding the date of cancellation) as provided in Paragraph "F" of the Agreement. He said he based his decision on his opinion that he could do better in competition. He admitted that he accepted and wrote business for former policyholders of plaintiffs until he was enjoined. He then went into another type of business. Defendant admitted that in some instances he used various policyholders' payments to pay premiums on other and different policies. He said his new companies mailed out notices to plaintiffs' policyholders announcing defendant's termination with Farmers.

On May 11, 1964 ($5,000 bond required) the court issued its decree of temporary injunction under which defendant was "enjoined and prohibited from directly or indirectly in any manner soliciting, accepting or servicing for or on account of himself or any insurer, agent or broker, the insurance business of any members or policyholders of the (naming plaintiff companies) that were formerly assigned to his agency within Jackson County and the counties immediately adjacent thereto, and defendant is enjoined and prohibited from directly using or furnishing to others any information or list concerning any such policyholders or their policies".

Defendant filed answer and a motion to dissolve. The issues therein raised and upon which defendant relies on appeal will be referred to hereinafter. On December 29, 1964, the court, having been advised as to the one year time limitation, amended the temporary injunction so as to make it inoperative after December 30, 1964, or one year after date of termination of the Agreement.

Defendant contends (1) the contract was invalid and unenforceable because it nullified defendant's right of ownership of the good will of the business; (2) plaintiffs are estopped to enforce the contract; (3) plaintiffs knew the manner in which defendant had been making remittances for three years and therefore waived any right to object. Defendant also moved for a jury trial to assess his claim for damages. On December 20, 1965, the court took up the issues raised by defendant's pleadings, heard the evidence and on February 21, 1966, entered findings of fact and a judgment as follows in part (summarized):

"(1) That defendant Reid failed to remit funds promptly of the plaintiff companies and failed to remit promptly funds in accordance with the prescribed rules of plaintiff companies;

*     *     *     *     *     *

"(2) That plaintiffs first acquired knowledge on December 7, 1963 that defendant had not remitted funds promptly and in accordance with the companies' prescribed rules; the Court finds no evidence that plaintiffs waived their right to terminate the agreement because of defendant's failure to remit funds promptly; the Court further finds that plaintiffs' vice-president and regional manager made no representations to defendant ad-

vising defendant that should he decide not to sell his agency he would be free to solicit and accept the insurance business of plaintiffs' policyholders;

\* \* \* \* \* \*

"(3) The Court further finds that following the termination of said Agent's Appointment Agreement defendant did contact and solicit the policyholders of plaintiff companies; \* \* \* that defendant did cause more than 60 policyholders of plaintiff companies to cancel their policies with plaintiff companies; that defendant did use the premium levy lists provided defendant by the companies in soliciting the policyholders;

\* \* \* \* \* \*

"(4) That plaintiffs had no adequate remedy at law and would be irreparably damaged unless defendant was enjoined; \* \* \*".

Then followed the decree that judgment be entered in favor of the plaintiff companies; that the temporary injunction was providently granted and that costs be assessed against defendant.

■ Appellant contends that on appeal we review this equity case de novo. This is true. However, Section 510.310(4), V.A. M.S. provides that in cases tried without a jury: "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses". The same direction as to appellate review is found in Rule 73.01(d), V.A.M.R.

In the instant case defendant had been the representative of plaintiff companies for just under three years. He was servicing over 1,000 Farmers policyholders. Some of. these insureds had been clients of Farmers for many years. The business was clearly not entirely the product of defendant's efforts. He had bought in as agent in the Jackson County area from a predecessor representative, whose relationship had been terminated for failure to make remittances promptly and under a contract similar to the one which is involved here.

■ The Agency Appointment Agreement out of which this litigation arose plainly, unambiguously and pertinently to this litigation provided: (1) the companies could terminate if the agent failed to remit premium payments promptly. The evidence does show such failure. Plaintiffs' managers and representatives so testified, citing specific examples and defendant admitted such was the fact; (2) the plaintiffs did so cancel; (3) in the event of cancellation, defendant agreed not to secure or attempt to obtain any of the accounts of plaintiffs which he had been servicing for a period of one year. The evidence shows violation of this agreement; (4) in the event of cancellation, defendant was by contract afforded the privilege or granted the option of selling his interest for a sum equal to two times the renewal premiums collected from such business for the six months immediately preceding cancellation. The evidence shows defendant was offered such opportunity and plaintiffs had produced a buyer therefor under these terms who was ready, willing and able and whom plaintiffs would approve, but defendant elected not to accept and not to sell.

It also seems apparent that plaintiffs had no adequate remedy at law by which they could stop the contract violations. Therefore, the injunction was providently granted and the judgment should be affirmed unless (and these are the points defendant presents on appeal) : (a) the contract itself is invalid and unenforceable because it nullifies defendant's alleged right to sell the good will of the business and because the contract is in restraint of trade and against public policy or (b) plaintiffs are estopped because they had induced defendant not to sell and to suppose they would not rely upon the covenant not to compete for a period of one year or (c) plaintiffs waived the prompt remittance requirement by allowing the defendant, without objection, to follow the practice of delayed payments for nearly three years.

■ We do not believe the contract is invalid. In 43 C.J.S. Injunctions § 148 pp. 755, 756, we find this statement:

"It is generally agreed that injunction will lie to prevent use or disclosure by an agent or employee of knowledge of the names of the customers of his former principal or employer, or of the customs, requirements, and preferences of such customers, where such information is of a confidential nature, not ordinarily ascertainable by the general public, and was obtained by the agent or employee for a specific purpose or by virtue of a fiduciary or confidential relation between him and his principal or employer; * * *".

In City Ice & Fuel Co. v. Snell, Mo.App., 57 S.W.2d 440, 442, defendant by written contract agreed that if he left plaintiffs' employ he would not for one year thereafter, sell, solicit or deliver ice, coal or fuel oil in the area. The trial court refused to enjoin. On appeal the contract was ruled to be valid and the injunction was ordered to issue, the court saying:

"The restrictions of the contract herein are limited as to time, namely, one year after the employee leaves the employment of the company. They are limited as to place, for they apply only to a particular territorial district within the city of St. Louis. They are further limited to apply only to selling, soliciting, delivering, and collecting for ice, coal, or fuel oil within the period and the territory named. In so far as this contract is concerned, defendant is free to engage in any business of any character whatsoever anywhere outside of the territorial district named. Within that district he is free to engage in any business except the particular activities named. Contracts of the nature of the one here involved have been upheld by the courts of this state in numerous cases. Attacks on such contracts have been made on various grounds, but it is now well established by the decisions of our Supreme Court and appellate courts that contracts similar to the one in this case are based upon a sufficient consideration, namely, the mutual promises of the parties, are not void for want of mutuality, are not against public policy, and are not void on the ground of restraint of trade".

To the same effect is the comment in Renwood Food Products, Inc. v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144, 150, 151:

"Covenants of the kind here involved, being in restraint of trade, were first regarded by the courts as contrary to public policy and hence invalid. The reason for such rule was two-fold, namely, injury to the public and injury to the employee. The restraint worked injury to the public by depriving it of the industry to which the employee was best suited, and tended to cast the employee and his family upon the public for support. It also fostered monopolies, prevented competition, and tended to raise prices. (citing cases). The doctrine had its origin at a time when the field of human enterprise was limited, and each man's industrial activity was necessary to the material welfare of his community. Travel was difficult, and the conditions of the times were unfavorable to the migration of persons seeking employment. Skrainka v. Scharringhausen, 8 Mo.App. 522, 28 Col.Law Rev. 81. But, with the improved facilities of travel, and the growing ability of workers to adapt themselves to different occupations, the reason for the rule disappeared, with the result that the courts began to uphold reasonable restraints on employment on the theory that such covenants were beneficial to both parties—being beneficial to the employee for the reason that it enabled him to dispose of his services advantageously, and beneficial to the employer because it protected him against a competition which would not otherwise have existed except for the employment. (citing cases).

"Also important in the changed attitude of the courts was the realization of the importance of requiring persons who, by

the solemnity of contract, had assumed certain engagements, to observe them".

This court in Fred A. H. Garlichs Agency Co. et al. v. Anderson, Mo.App., 226 S.W. 978, upheld a restrictive covenant covering Buchanan County and forbidding defendant from there engaging in the insurance business for five years. Again, our court in Thompson et al. v. Allain, Mo.App., 377 S.W.2d 465, upheld a restrictive covenant of three years covering an area within a radius of fifty miles from St. Joseph as to the practice of medicine.

In our opinion this contract is valid and enforceable. We shall not quibble as to "good will". Whatever defendant's rights consisted of were covered by the contract and he should abide by them.

■ What we have just said and ruled as to the validity and enforceability of the Agency Agreement really disposes of appellant's other points. The evidence shows and the trial court found that plaintiffs canceled the agreement. We find and the trial court found that defendant not only solicited, but actually procured business from policyholders of Farmers, and that he used the list of such policyholders which had come to him in his fiduciary capacity, in so doing. In our opinion the evidence shows neither estoppel nor waiver and if this question were viewed as disputed under the evidence, we would defer to the findings of the chancellor, who had the advantage of seeing and hearing the witnesses. Defendant's theory of estoppel is predicated upon the testimony of Lester Duncan, an employee of plaintiffs. Defendant says Mr. Duncan told defendant that he could either sell out or "battle Farmers for the business". It is a fact that defendant could either sell out or "battle Farmers" for new insurance business, but not for the contracts already held by Farmers until one year had passed after which the whole field would be open. As to waiver, the preponderance of the evidence, in our opinion, and in the opinion of the trial judge, is that the contract was canceled soon after plaintiffs learned that defendant was not remitting promptly and was using some policyholders' payments to pay premiums due on other accounts.

■ In State ex rel. Continental Ins. Co. of City of New York v. Becker, 336 Mo. 59, 77 S.W.2d 100, our Supreme Court ruled, syllabus 3:

" 'Waiver' is intentional relinquishment of known right, and to make out case of 'implied waiver' there must be clear, unequivocal, and decisive act of party showing such purpose, or acts amounting to estoppel on his part".

■ We have read some of the numerous opinions referred to by appellant in his brief. Most of these opinions are from foreign jurisdictions. We do not believe that the conclusions and holdings therein, based upon the opinions themselves or upon the quotations therefrom in appellant's briefs, are different from the law as declared in the Missouri opinions which we have cited hereinabove. For example, in Christensen v. Prudential Ins. Co. of America, Mo.App., 204 S.W.2d 459, cited by appellant, syllabus 1 states:

"An agent acquires no vested interest in renewals on writing of policy, but his right thereto depends on his contract with insurer, and, unless such right is expressly stipulated or clearly implied, he is not entitled to commissions on renewals after termination of employment".

We believe the contract involved in this litigation is a valid and enforceable contract; that defendant has not shown either estoppel or waiver; that plaintiffs' only adequate remedy herein is by injunction; that the necessary findings of fact made by the trial court are supported by substantial, competent evidence, furnish adequate support upon which to base the judgment and that the judgment itself is not clearly erroneous.

The judgment is, therefore, affirmed.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

HOWARD, P. J., and CROSS, J., concur.

MORGAN, J., not participating because not a member of the Court when the cause was submitted.