**OSAGE GLASS, INC. d/b/a Mobile
Auto Glass Installation Centers
a/k/a Magic Auto Glass, Appellant,**

v.

**Daniel J. DONOVAN, Jr., Respondent.**

No. 66559.

Supreme Court of Missouri,
En Banc.

June 25, 1985.

As Modified on Denial of Rehearing
Aug. 7, 1985.

Jack L. Campbell, W. Terrence Kilroy, Kansas City, for appellant.

Eugene F. DeShazo, Kansas City, for respondent.

BLACKMAR, Judge.

The plaintiff's business consists of the installation of automobile glass. Its headquarters is in Cameron, Missouri, with installation operations in five Missouri cities, including Kansas City. It is in competition

with several other glass installing operations in Kansas City, Missouri and in the rest of its territory.

The defendant, Daniel J. Donovan, was trained as an automobile mechanic and glass installer in military service and was separated with a high specialist rating. On separation he sought and obtained employment with plaintiff in Cameron as a glass installation trainee. At the time he was employed he signed an employment contract reading as follows:

I, Daniel J. Donovan, being a prospective employee of Glass Speciality Company,[1] a Corporation, authorized to do business in the State of Missouri, in consideration of my employment with the said Glass Specialty Company and the special training and technical education to be furnished me, at no cost to myself, by the Glass Specialty Company, do hereby acknowledge and agree, if accepted for employment by the Glass Specialty Company, to diligently apply myself to any and all special training and educational programs provided by the Glass Specialty Company; and do further acknowledge and agree that the Glass Specialty Company will be furnishing me special training and experience in sales and promotion and business development of Glass Specialty Company and that I will have access to confidential customer lists of Glass Specialty Company that that said Glass Specialty Company's auto glass installation business covers the entire State of Missouri; and that I promise and covenant that I will not, during the period of three years from and after termination of my employment, for any reason, with Glass Specialty Company, associate myself with or engage in, directly or indirectly, any business which is in competition with that of Glass Specialty Company in the automotive glass installation business, or any of Glass Specialty Company's affiliated companies, within the State of Missouri; nor will I solicit or in any other manner work for or assist any competitive automotive glass installation business within the State of Missouri for a period of three years from and after the termination of my employment, for any reason with Glass Specialty Company.

WITNESS MY HAND, that I have read the within and foregoing agreement and understand its contents and that if accepted for employment will abide by the terms hereof, this 7 day of April, 1980.

He was promoted to installer after two to four weeks and in November, 1980 became operations manager in Kansas City, where plaintiff was the first company to engage in the mobile installation of automobile glass. For description of his duties in Kansas City we borrow from the opinion of the Court of Appeals, which states the facts from a point of view most favorable to the defendant, and consistent with the defendant's testimony, as follows:

Magic serviced both insurance companies and agencies, fleet operators, independent body shops, automobile dealerships and specialty vehicle manufacturers. Donovan had contact with these customers through his employment as operations manager for Magic. With respect to insurance agencies or companies, Magic was contacted by either the agent or a customer of the agent advising Magic that an automobile windshield needed repair. If an insurance company made the initial contact, Magic would contact the agent or claims department of the company to verify coverage, and if verified Donovan would send installers to the location to have the glass repaired. The agent or the company was then billed directly and the insurance company's customer was billed for any deductible. Magic would service automobile body shops and car dealerships in the same manner, but Donovan's contact with dealerships was either with the service manager or the body shop manager

---

1. The employer's name was subsequently changed to Osage Glass, Inc. by amendment to the Articles of Incorporation.

and the evidence shows that the initial contact was made with Donovan by those managers rather than being initiated by him. The calls to Magic were either taken by the secretary and referred to Donovan, or in some instances were taken by him when Magic's three telephone lines were tied up with incoming calls which the secretary could not therefore handle.

According to Kratofil, Donovan did bring in some new customers as new accounts: Greg's Custom Vans; M & M Body Shop, Inventory Reduction Sales; Melton Trucks,; and Vee Village. Donovan testified that he did have calling cards with "Glass Specialty System" imprinted with his name as operations manager. He left these on windshields when he made a call to show he had been there when a customer was absent. The record shows that Donovan hired a glass installer, Baskin, and terminated a secretary, Robyn Witson. He handled personnel problems, recorded and monitored product breakage and damage, and was responsible for the day-to-day operations of Magic's Kansas City facility. He was also involved in establishing Magic's labor relations.

Donovan was the person in charge of the Kansas City operation. The salesman, Kratofil, was not technically trained. The chief operating operator, Chamberlain, was in Cameron.

Donovan continued as operations manager until October of 1982, at which time he gave two weeks notice of his intention to resign. Chamberlain relieved him of his duties immediately, and he accepted employment with a competitor, W.M. Kryger, d/b/a Installers Unlimited, in Kansas City, Missouri. Plaintiff brought suit seeking temporary and permanent injunction.

Evidence was heard on December 27, 1982, apparently on the issuance of a temporary injunction. On January 5, 1983, the trial court entered judgment as follows:

\*　　\*　　\*　　\*　　\*　　\*

Further, the Court specifically finds that plaintiff did not possess a trade secret, and that plaintiff's customer list was nothing more than could have been compiled from directories or other generally available sources. Therefore, the covenant not to compete at issue served only to prevent defendant's economic mobility and reduce his bargaining power and did not protect any legitimate business interest of plaintiff.

\*　　\*　　\*　　\*　　\*　　\*

Both parties then stipulated that the Court had heard all required evidence and that final judgment could be entered. The plaintiff appealed and the Court of Appeals, Western District, affirmed the denial of relief pointing out that there was no showing that Donovan used his customer contacts to plaintiff's detriment, or made up a customer list, or tried to use the plaintiff's alleged "trade secret" of bidding methods on GSA contracts on behalf of his new employer. The Court of Appeals then discussed equitable considerations, holding that the harm to the plaintiff was outweighed by the detriment to Donovan in the use of his artisan skills. We granted transfer to probe the possible conflict between the opinion of the Court of Appeals and other cases in the important area of covenants not to compete.

We of course take the case as on original appeal. The trial court found in favor of the defendant, and review is under the standard of *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976); Rule 73.01. We examine the reasons given in the trial court's judgment entry, and in the Court of Appeals opinion, as probative of the contentions advanced by Donovan and the courts' response to those contentions. We are convinced that, based on the uncontradicted evidence in the record, there was legal error in the denial of relief. We therefore reverse and remand with directions to grant an injunction as prayed.

■　Much has been written about an employee's covenant against working for his employer's competitors. Agreements of this kind restrain commerce and limit the employee's freedom to pursue his or her trade. Enforcement of such agree-

ments, therefore, is carefully restricted. *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 303 (Mo.App.1980), Gunn, J. Covenants against competition must serve a proper interest of the employer in protecting the good will of a business, and must be reasonably limited in time and space.

The defendant makes no direct challenge to the time limitation of three years and the space limitation of the state of Missouri. The evidence shows that whatever customer contacts the defendant had were in the Kansas City area. We do not have to speculate about the enforceability of the covenant had the plaintiff accepted employment elsewhere in Missouri.[2] It is appropriate to consider, in analyzing equitable considerations, that the covenant did not restrict the defendant's employment in Kansas.

The defendant argues that he is simply an artisan and that the plaintiff-employer does not have a protectable interest in his skill. He also argues that information as to methods of bidding on GSA contracts does not rise to the level of "trade secret", and that there was no protectable customer list which could not be obtained from standard directories listing insurance companies, body shops, fleet operators, and similar sources of business.

The trial court accepted Donovan's contentions that he did not possess trade secrets and did not have access to any confidential customer lists which could not have been compiled from generally available sources. We do not disagree with these findings, but do not believe that they are dispositive of the case. The findings indicate that the trial court viewed the area of permissible protection too narrowly. An express agreement not to compete may be enforced as to employees having substan-

tial customer contacts.[3] It is not necessary to show that there is a secret customer list. The uncontradicted evidence shows that Donovan was the only technically knowledgeable person at the Kansas City operation who had regular contacts with customers during his two years of service as operations manager.

The contract is not in wholly satisfactory form from the standpoint of enforcement. The defendant signed it when he first entered the plaintiff's service as an installer trainee and a new contract was not signed when he became operations manager in Kansas City. The contract refers to "the special training and technical education to be furnished me", which, standing alone, is not a protectable interest. The agreement also speaks in terms of "customer lists" and makes no reference to "customer contacts." The restrictive provisions of the contract, however, are unequivocal and the defendant's own testimony demonstrates that the plaintiff had a protectable interest in customer contacts. The imperfections in the agreement are not such as to require denial of relief. *Cf. American Pamcor, Inc. v. Klote,* 438 S.W.2d 287 (Mo.App. 1969).

The cases relied on by the defendant are distinguishable. In *Mutual Loan Co. v. Pierce,* 245 Iowa 1051, 65 N.W.2d 405 (1954), the court found no showing that the defendant had an opportunity to take some of the plaintiff's business to his new employment. The defendant's employment as a collector was not designed to develop favorable contacts. *Ridley v. Krout,* 63 Wyo. 252, 180 P.2d 124 (1947), simply holds that the basic skill of a craftsman will not support a restrictive covenant. There the defendant was a mechanic. These cases are consistent with *Ibur & Associates Adjustment Co., Inc. v. Walsh,* 595 S.W.2d 33

---

**2.** In *Orchard Container Corporation v. Orchard, supra* at 303–304, the court held that the covenant would be enforceable only within a 125 mile radius, whereas the contract provided a 200 mile restriction.

**3.** *Herrington v. Hall,* 624 S.W.2d 148, 152 (Mo. App.1981). *Deck & Decker Personnel Consult-*

ants, Ltd. v. Pigg, 555 S.W.2d 705, 707 (Mo.App. 1977); *House of Tools & Engineering, Inc. v. Price,* 504 S.W.2d 157, 159 (Mo.App.1973); *Mills v. Murray,* 472 S.W.2d 6, 12 (Mo.App.1971); *Renwood Food Products v. Schaefer,* 240 Mo. App. 939, 223 S.W.2d 144, 151 (1949).

(Mo.App.1980), in which plaintiff solicited business for an adjustment firm. The court found that the employer had no protectable interest because the persons solicited were those who had suffered casualty loss, and there was little likelihood of repeat business. In none of these cases, or others the defendant relies on, was there a showing that the employee who had signed the restrictive agreement was in the position to divert business from his old employer to his new one.

■ The Court of Appeals apparently considered that the plaintiff had to show an actual attempt to solicit its customers. This is not a requirement of the law. If it were, a plaintiff such as this one, who filed suit very quickly after the apparent violation occurred, would be disadvantaged. The purpose of the restriction is to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage. If the covenant is lawful and the opportunity for influencing customers exists, enforcement is appropriate. *See Renwood Food Products, supra* at 152.

■ Nor is it necessary for the employer to show that actual damage has occurred, in order to obtain an injunction. The actual damage might be very hard to determine, and this is one reason for granting equitable relief. The significant circumstance is potential for damage.

There remains the question whether enforcement may be denied on balancing of the respective interests of the parties, or some other general equitable principle. Donovan argues hardship in being unable to pursue his trade. He also claims that he was fully trained by the Army in glass installation, and, contrary to the assertion in the contract, did not receive any substantial training from the plaintiff. He nevertheless accepted employment on the terms tendered. The courts should relieve him of his voluntary obligation only for a substantial reason. *See USA Chem. Inc. v. Lewis,* 557 S.W.2d 15, 24 (Mo.App.1977), Higgins, J.

We are persuaded, on the above, that Donovan, as operations manager of the plaintiff's Kansas City operation, occupied a position in which he could cause substantial harm to the plaintiff by going to work for a competitor. Even if he received a minimum of training from plaintiff, he accepted a managerial position. There is no evidence that his compensation was not in line with the skill and responsibility required. He continued in this position for nearly two years. He dealt directly with the customers on important problems. The employer had reason to believe that Donovan could harm the business by going to work for a competitor and attracting customers to the competitor. Customers of the plaintiff well might seek him out at his new location, without any effort on his part. The covenant was not unreasonable as applied to Donovan.

■ We conclude that, under the undisputed evidence, the plaintiff had an interest which was the proper subject of protection and that Donovan violated the covenant. By the consistent course of Missouri decisions, enforcement is in order.

The testimony was heard on an application for temporary injunction. Both parties agreed, however, that the evidence had been fully heard and that final judgment could be entered. We reverse the judgment and remand the case with directions to enjoin Donovan from working for a competitor of the plaintiff in Missouri for three years from October 15, 1982, and for such further proceedings not inconsistent with this opinion as may be necessary.

RENDLEN, C.J., HIGGINS, BILLINGS and DONNELLY, JJ., and FINCH, Senior Judge, concur.

WELLIVER, J., dissents.

GUNN, J., not sitting.